Good morning, Your Honors. May it please the Court. Gregory Keenan, appearing on behalf of Appellants Ramirez. I'd like to reserve three minutes, if I may. Below, the District Court dismissed plaintiffs' various federal and state trademark claims based on lackeys. Respectfully, that was error, and it was error for several independent reasons. First, it was error because plaintiffs' trade dilution claims have a congressionally imposed statute of limitations, and as such, the Supreme Court's rationale from Petrella and SCA Hygiene, we would argue, prohibited the use of lackeys to completely bar the trade dilution claim. In both Petrella and SCA Hygiene, the Supreme Court explained that lackeys cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress. Our briefing pointed the Court to 28 U.S.C. Section 1658A, which applies uniquely to the federal trademark dilution claims as opposed to the general infringement claims. Section 1658A imposes a catch-all statute of limitations of four years, and so our initial argument is that the rationale from the Supreme Court's Petrella and SCA Hygiene decisions demonstrate the... Counsel, I guess I'm confused about one thing. Could you just clarify something? What happened to the 2011 lawsuit? Yes, the 2011 lawsuit was voluntarily dismissed by the parties without prejudice. So you all knew that this was happening since then, right? That's right. Yes, Your Honor.  Two reasons. So first of all, there are two independent reasons why lackeys is just precluded as a matter of law, at least for barring the entire action. So the first is the Petrella and SCA Hygiene. The second is the deliberate pirate exception. So as part of the dismissal, there wasn't some agreement of, you know, there was nothing? There was no indication. Was it a handshake type of a thing? How did it happen? There was no indication that the parties wouldn't pursue actions against each other moving forward. And also there's a new factual predicate that emerged later. So Defendant Navarro did try to register in 2016 after that lawsuit was dismissed, his Los Cominantes H.N. mark, which created a new factual... Counsel, I'm glad you brought that up. Did your clients know about those attempts in 2016? When did they become aware of the fact that Navarro tried to register the trademark? I'm not sure that they knew when he registered. Defendant Navarro was informed by the Trademark Office that the mark was confusingly similar to Plaintiff's mark. What the record does indicate is that Plaintiffs became aware that there were increased uses by Navarro. And I think the second and third trademark registrations, the ones surrounding specifically Los Cominantes H.N., provided a new basis for taking particular concern with... And what years were those? It was the 2016 one, and then the second one was in 2018. Okay. And so I understand that you had or they had knowledge 2016 and 2018, but this lawsuit wasn't brought until 2020, correct? That is correct, Your Honor. And it's my understanding as well that there were two other cases before the Sotelo. I'll just call it the Sotelo case in 2013 and the Martinez case in 2017. Yes, Your Honor. Who was the biggest infringer of those three, Navarro, Sotelo, and Martinez? I think they were all equally big or concerning infringers. The reason, pragmatically, I think it made sense to go for the other two first perhaps, is one that was trying to go after, I guess, the promotional angle of clubs in particular as opposed to the performer. And then, of course, the two subsequent attempts to register the mark by Defendant Navarro in 2016 and 2018. It was just becoming a problem that wasn't going away. When did it become a problem then? Because you had a lawsuit in 2011, and then that was dismissed, and we don't understand why. So did it stop being a problem at some point after 2011 and then started to be a problem again? And if so, when? The record is not clear, but I do think that there is an issue that it became a problem. Oh, the record is not clear, but you have your client. So why don't you tell us? I'm sorry, could you repeat the question, Your Honor? Why don't you tell us? I mean, that question never came up? The attorney who represented the Ramirez's passed away. So the attorney who made the decisions is deceased. And your clients never knew? It was dismissed without their knowledge? No, of course it was with their knowledge. And they just didn't understand why it was dismissed? I'm sure that they do understand why it was dismissed. And you just don't know why? You yourself don't know why? I personally, as appellate counsel, looking at the record with the deceased attorney, don't know the precise reason. So, counsel, the reason stated in the record at the statement of undisputed facts, paragraph 11, is that Steve Iyer dismissed the suit because the attorneys did not like the judge. That doesn't really make sense to us, though. It didn't make sense to me either. You didn't reach out to your clients and say, what, any background on this? I'm just confused because you bring a suit in 2011. You wait nine years. So was there a change after the dismissal and then, I mean, at what point? Was it to 2016 where you said, oh, they're infringing again? I would say that the subsequent registrations and the fact that our clients received, it was in the record it says that there was a concern that there was a Los Cominantes performing in Atlanta during the time period that Defendant Navarro is performing in Georgia and Atlanta. So between 2019 and 2021, Defendant Navarro is performing in Atlanta using the Los Cominantes mark and our clients are getting questions asking if this is a real Los Cominantes. So it was becoming an increasing concern based on people reaching out to them and then also just the attempts at registering. And I apologize, what year did you say that was, that the concerns started increasing? So the registrations were 2016 and 2018. The performances in Atlanta specifically, those came in 2019 and 2021 was the period that Defendants were performing there. So the five years between 2011 and 2016, no concerns? I mean, of course, that's why we have a lackey's question before us, but our argument is that regardless of whether or not there's a lackey's question, one, under Petrella and SCA, the effect of that is to prohibit the district court from at least, as to the trade dilution claims, being able to dismiss it entirely. And the second would be that a deliberate pirate exception to lackeys should have precluded lackeys as a matter of law under this court's Danjak decision. And there's at least three bases for the deliberate pirate exception here. One, of course, is that the USPTO is telling defendants repeatedly, this mark is confusing. The second is that they have a past business relationship with plaintiffs, and leading treatises have pointed out that when former business partners go their own ways, that the person who then takes an identical or confusingly similar mark with them has the knowledge that they're infringing on that mark. So this isn't a case of someone lying in wait and someone being unsuspectingly swept up, as in the Sixth Circuit's NALPAC decision. There, the defendant, and this is a case relied on by the district court and defendant, in NALPAC, the defendant conducted a search, couldn't find any conflicting marks. The USPTO told them there is a conflicting mark and we can't register you. The NALPAC defendants stopped producing the goods, sold the remaining inventory, and wound down. It wasn't a case of continuing use. By contrast, district courts within this circuit will point out that if the USPTO tells you that there is a conflicting mark, that continuing to use it is an indicia of deliberate use that should preclude black use as a matter of law. So, again, you're talking about confusion. I'm trying to figure out how you've made a strong likelihood of confusion when I believe the only evidence, and I wanted to give you a chance to talk about this, the only evidence of confusion you have put forward are two uncorroborated statements. Well, there's also that the marks themselves are inherently confusing because they're essentially identical, as the USPTO pointed out. So that's what you're resting on for confusion is the marks and the two uncorroborated statements. Is there anything else? Yes, there's also those uncorroborated statements. If you look at it in the totality of the record, there's also the performances in Atlanta. So essentially the USPTO says you can't have this mark because if you use this mark, it's going to confuse people. There are statements of people being confused across the country, and they line up perfectly with defendants' performances in Atlanta between the 2019 and the 2021 period. And additionally, there's just what we would argue are just bright-line legal bars on either, A, the applicability of LACHI's here, or two, at the very least, the ability to use LACHI's to entirely get rid of the claim, both because of the Petrella-type concerns surrounding the dilution, but also that it's very rare to apply LACHI's to preclude prospective injunctive relief. I guess what is your best Ninth Circuit case showing that LACHI's can only operate as a limitation on remedies and not on the injunctive relief? Sure. It would be the Danjak case and then going further back, the Stork case from 1945, which was clarified by both. But the Stork case predates all of the, I think, the three cases that you cite or that is cited, and the court has held to the contrary and also seems like in Stork was discussed in Prudential when this court determined that LACHI's could bar injunctive relief. So I'm just trying to square your arguments with our cases. Yeah, I think there's two responses on that. So the first is that Prudential, and this is the Danjak case that clarifies it, Prudential essentially said that the Supreme Court had a case from the late 19th century and this court's Stork case imposed a bright-line rule. That wasn't a bright-line rule in every instance, but in cases of deliberate infringement it remained one. So that was how Danjak explained what Prudential clarified about Stork. Well, I thought Prudential held that the statements made in Stork Restaurant that LACHI's could not bar injunctive constituted dicta and that the Prudential panel's interpretation should control here. But then Danjak subsequently said that Prudential applied to us, the bright-line rule applied to a very specific subset, which would be deliberate infringing cases or willful pirate cases. And as a separate matter, it also said that generally speaking that general rule is still good. There are some exceptions to it. It's not an absolute bright-line, but typically it shouldn't bar prospective injunctive relief. Counsel, what's the appropriate statute of limitations in this case? It would be four years. And when does that four years start? The four years would start from, so it would go back from when the case was filed to 2016 and all the ongoing infringements, including the ones that were at the time prospective. There were some bookings that were lined up through 2022. The case was filed in 2020. It would be live claims. It seems like you want to focus on the catch-all provision. I'm trying to understand that argument because I think even if we concluded that you were correct, that the catch-all statute of limitation applies, even though I think the Ninth Circuit has declined to apply that. How would that help your case, given that the complaint was filed after the limitations period would have expired? How does that help you? I don't think the limitations period would have expired, right? So the complaint is asking for relief regarding ongoing infringements and including injunctive relief for prospective infringements. So there are live claims. Did you raise this argument at the district court level? That specific one regarding the dilution claim was not raised at the district court. However, one appellee did not argue waiver, and I think that's because it's not really the type of issue that would be appropriate for waiver. There's a statute codified by Congress in two Supreme Court cases that explain the legal relevance of that codified statute of limitations for the application of lackeys. Did you want to reserve? Yes, please. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Larry Zerner. I represent Martin Navarro. Mr. Navarro has been performing as Los Comandantes H.N. since 2011. As you know, they filed a lawsuit against him in 2011. That lawsuit was dismissed. He has continued to perform. Counsel, do you know why that 2011 lawsuit was dismissed? Were you counsel there or no? I was not counsel at the time. I have my theories. The one thing that may be was that Manny Real was the judge. Do you know who he was? So that's all I got. I wasn't there. But since then, it appeared that they had sort of a live-and-let-live relationship. The Ramirezes were off suing the other people using Los Comandantes' name. Those people were using Los Comandantes, not with any additional moniker. Counsel, but they're very similar. In fact, they sound identical. Well, Los Comandantes, but he used the H.N. for Humberto Navarro, his dad, to separate himself. And I think he did separate himself because in the 10 years more that they were operating together, plaintiffs were unable to produce any evidence that anyone had confused Mr. Navarro's band and the Ramirez band. There was no evidence that Atlanta band was my client's band. Let me ask, because that goes into the unclean hands argument that's being raised, and I guess I wanted to hear from you why the doctrine of unclean hands should not apply to your client. Give, for example, that Martin played Los Comandantes songs. He continued to use the name Los Comandantes after the U.S. PTO rejected his trademark application for being confusingly similar to Appellant's, and he knew the existence of Appellant's mark when he formed his band. Can you respond to that? He was not, well, okay, so let's look at the timeline. At the time when he started using the band, there was a previous trademark, the earlier trademark that was owned, co-owned by Augusto Ramirez and Humberto Navarro, his father. That was, so when he started using it, he believed. Well, but when he passed away, I think everyone got their share, correct? When you say, no, no, no, what happened was at that point he passed away, and then Martin began performing as Los Comandantes H.N. Los Comandantes was still performing. Right, but the estate got what was due to them based upon that earlier mark, correct? There was, no, that's not what he was getting, no, that's not what happened. That's not what happened. Martin was performing, and they sued him, is what happened. But Martin believed that because his dad co-owned that trademark, that that right had descended to him. How, where did he get that belief from? He's not a lawyer, but that's what he believed. He was not trying, so he believed he had, like, but he believed he had. Council, we all have beliefs about many things. I understand. No, I'm not saying it was, but that's what he believed. He had to, he was not trying, he believed that he owned it. He believed he could co-own the trademark and could use it. Then that trademark expired in 2012. Then in 2013, this new trademark was registered by the Ramirez, Augustin Ramirez and his children, his two sons. That's the mark that was going on. With this mark that they're suing on is, was registered. Martin had been operating under Los Comandantes H.N. for almost two years. And they had not, they had sued him and dismissed it, and he kept going. So he was, he was not, he's not trying to confuse people. One of the things that is a little, I've learned about the advertising. Of course, I guess when the 2011 case was dismissed, did he think I'm free to go here, they're fine with me continuing. Was that his belief? Yeah. That was his understanding? Yeah, yeah. Okay. So why did he try to register the trademark in 2016? Well, he was trying to register the H.N. trade part of it. He wanted to protect that. He wasn't going to stop, but he wasn't going to use it, and he never ever tried or even thought about trying to stop them from using Los Comandantes. He was just trying to protect his mark. Okay. And when he was unsuccessful because they were found to be confusing, did that make him pause and say, ooh, there might be an issue here? No. He didn't think about it. He had already at that point been using it for five years, and they hadn't sued him or even objected. There were no further objections at that point. What is your understanding of when it was the first time that the appellants contacted Mr. Navarro again? After the 2011 lawsuit's dismissed, he continues to work under Los Comandantes H.N. When was he first contacted by the appellants saying, hey, this is our name, why are you using it? I don't believe there's anything in the record other than the complaint itself. There is a relationship between the bands over the royalties to the music because obviously they're both Martin's dad is on their albums and he's entitled to royalties. And so there was interaction with another lawyer, Dorothy Richardson, and so they were talking, but there's nothing in the record that they said, stop using, stop performing, or anything like that. But they were talking about the royalty. They had royalty disputes and they still have the royalty dispute. I guess what I'm trying to figure out, counsel, is what triggered this lawsuit then? If your client had been using the mark since 2011, there was a lawsuit, it was dismissed, so then he thought, hey, I'm free to use it. He went and tried to register in 2016. He was unsuccessful because it was too close to the Los Comandantes trademark. So then what triggered the lawsuit? Well, nothing on my client's part. What had happened, obviously this is COVID, when the lawsuit was filed, nobody's making any money, and that may have been the thing that caused them to, because no one was performing, so no one was making any money. And your client was aware of the other lawsuits, correct? The one against Sotelo and Martinez? The record is that later he found out. He did not know at the time. They didn't tell him, oh, I'm suing these other people. These other people had performed with the band at some points. They were other musicians. Go ahead. Oh, real quick. Yeah, they're not just other people because I believe it was Martinez. Yeah, Vicente Martinez in the 2017 case, wasn't he one of the singers in Navarro's band? I believe so, yes. I mean, they have a relationship. It's not far-fetched to think that Martinez could call him up and say, hey, I'm getting sued. You don't need to speculate as to that, but I'm just interested to know what your client knew and when he knew it. I don't think he knew anything. On the trademark dilution claim, I mean, counsel just said that there's a four-year statute of limitations, and I understand how he gets there. Can you explain why that's correct or not? Your Honor, I mean, it's a very original argument. We couldn't find any case that ---- Well, Congress passed a law in 1990 saying that claims brought pursuant to a later enacted federal statute will have a four-year statute of limitations, and that's 28 U.S.C. 1658. The federal statute giving rise to a claim for trademark dilution was enacted in 1996. So setting aside the laches claims, laches for a moment, do you agree that Section 1658 establishes a four-year statute of limitations? It just doesn't square with what we know about trademark law, which is the Congress has always known that we're going to put these laches in because the issues are really equitable, and there's a lot of issues and a lot of rules, a lot of tests, a lot of parts in deciding whether these things are infringing, whether we're going to apply laches, you know, how much money you spend, how much confusion there is, and to say, okay, for infringement we have this laches rule and you can apply that, but for dilution you can sue whatever you want as long as there's still some use within the four-year period, even though you've known about it for 20 years, you can now bring it when arguably dilution is less worse than infringement. If someone is selling knockoff Nikes, that's worse than if they're diluting the Nike brand, I would argue. And to say that the Congress intended that the infringement, you can say you can use laches, but dilution you can't, it just doesn't square what it is. But even if we do go there and you say, okay, there is dilution, dilution applies to famous marks, there's no evidence in the record that this was a famous mark. I mean, they're a very talented band, Los Caminantes, but I don't think anyone would say they are of the renown that you would need to get to that level. Well, some of us have been listening to Los Caminantes for quite some time. Sure. I echo that. I was wondering if any of you knew of the band. It was my sister's favorite band growing up. And so I'm very familiar with Los Caminantes and I'm very familiar with your clients as well. But at the end of the day, the issue is prejudice and harm. That's the issue for laches. The prejudice to my client would be devastating. He has built up this business 13 years. This is his livelihood. Well, but you can see why they'd be upset that you're diluting their property. I could see why they're upset, but yet they were unable to present any evidence of even a dollar in loss to them. They will not lose a dollar if you deny their appeal and we keep going at the status quo. They're not losing business. Bands are different than shoes and laches. You're there. Someone's going to see a certain person on a certain day. It's a set time and you're going to be there. And you're only there 52 weekends in a year. You've got to be in a certain city. That's where you are. It's not an unlimited product like that. My client would be very harmed. They waited and waited. He built up this business and to allow them to now take it away from them. That's what laches is supposed to prevent. If there's no more questions. Thank you. I'd like to just start quickly with the defendant's belief that he somehow inherited the Caminantes HN trademark. It's worth noting that his father didn't use a memorial to himself, the Caminantes HN, so why he thought he inherited that mark is a little confusing. And certainly when the USPTO told him twice that it was confusing and rejected it, he should have been disabused of that notion, but he just kept using it. Consequences be darned. To his last point, you all waited forever. Yes, I'll just point to the two bright line legal rules that restrain the effects of laches and then also highlight that he's continuing to use it. And also I just want to highlight that Defendant Navarro did testify. He was aware of the suit with Juan Navarro, that Juan Navarro was actively promoting and had been for a number of years his business. We had close business relationships. It's at 4ER731, and he knew that they had been enjoined for using the Caminantes mark. So doesn't that cut both ways, though, counsel? Because then doesn't he think, well, they're not coming after me, so they must agree that I'm allowed to use Los Caminantes comma HN. I don't think so if you look at the fact that the USPTO is rejecting it. The Nalpe case is a great study in contrast where that's not a continuing use case. You're just not allowed to keep when you know people are being sued and the USPTO is rejecting you and you have a former business relationship. You can't just keep using the mark and then cry laches. And I think that's why it's so important for us to understand why this case was dismissed in the first place. Was there some sort of, as my colleague here said, a handshake agreement? We don't understand if this is such a big deal, why the wait? What we know from the record is that the attorneys, and it appears both attorneys, didn't like the judge. It's a very cryptic remark. I don't know what it means. The attorney who represented our family passed away, so we don't know. But it doesn't change the fact that there are bright-line legal parameters on what lackeys, when it can apply, and the effect. And I would just say someone who continues to use a mark after the USPTO is repeatedly rejecting them, look at the Nalpec case, and it's a study in contrast of that's just not the type of case where it's a deliberate pirate exception to lackeys, and then we have the Petrella and SCA argument as to the dilution. Anything else? No, Your Honors. Thank you very much for your time today. Thank you both for your oral argument presentations here today. The case of Agustin Ramirez v. Martin Navarro is submitted.
judges: MURGUIA, MENDOZA, ALBA